

# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# IN THE COURT OF WORKERS' COMPENSATION CLAIMS
# AT KINGSPORT

| | | |
|---|---|---|
| **Darrell Manuel,** | ) | **Docket No.: 2015-02-0108** |
| **Employee,** | ) | |
| **v.** | ) | **State File No.: 11930-2015** |
| | ) | |
| **A-1 Workforce, Inc.** | ) | |
| **Employer,** | ) | |
| **And** | ) | **Judge Robert Durham** |
| | ) | |
| **Technology Insurance,** | ) | |
| **Carrier.** | ) | |

## COMPENSATION HEARING ORDER DENYING BENEFITS

On April 30, 2015, Darrell Manuel filed a Petition for Benefit Determination to determine if A-1 Workforce is obligated to provide workers' compensation benefits for an alleged work-related injury sustained on February 10, 2015. The dispositive issue is whether Mr. Manuel's chest pain and nausea, which led to the cardiac catheterization and resulting femoral nerve injury, are causally related to his employment with A-1 Workforce.[1] The Court finds the evidence submitted by Mr. Manuel is insufficient to establish a causal connection, thus requiring the Court to deny his request for workers' compensation benefits.[2]

### History of Claim

Mr. Manuel is a thirty-six-year-old resident of Washington County, Tennessee, who worked as an employee for A-1Workforce, a temporary staffing agency. (T.R. 1.) Mr. Manuel testified that in February 2015, he was working on assignment at Fiber Innovation Technology (FIT) in Johnson City. FIT assigned Mr. Manuel to its

---

[1] The parties raised additional issues in the DCN; however, given that the Court is denying workers' compensation benefits based on this threshold issue, it will not consider the remaining issues.

[2] Additional information regarding the technical record and exhibits is attached to this Order as an Appendix.

1

warehouse, where he worked at the end of a conveyor belt transporting bags of material. He removed the bags from the belt and stacked them on pallets.

During the first week of February 2015, FIT began installing a new assembly line in the warehouse where Mr. Manuel worked. In order to complete the installation, FIT used a boom truck inside the warehouse to lift individual parts. Mr. Manuel worked approximately twenty-five to thirty feet and to the left of the rear of the truck. Mr. Manuel testified the diesel fumes began bothering him and a co-worker, so they opened one of the bay doors. Shortly thereafter, a FIT employee closed the door, stating the warehouse had to maintain a certain temperature.

At the end of his shift, Mr. Manuel called A-1 Workforce and complained about the diesel fumes. When he next worked, the boom truck was not in operation; however, on February 10, 2015, the truck was running again. Mr. Manuel testified the ventilation fans located at the back of the warehouse were not operating.

Mr. Manuel testified that by 9:30 a.m., he became nauseous and his heart began beating rapidly. He became alarmed and told his supervisor, Chad DePriece. Mr. DePriece noted in the accident report that Mr. Manuel complained of a "sweet smell" that made him sick and raised his heart rate. (Ex. 6 at 96.) He advised Mr. Manuel to take an aspirin and eat something. Mr. Manuel did so, but after another half hour, he grew so nauseous he vomited. Mr. DePriece took him outside for a few minutes, and he began to feel better. However, upon re-entering the warehouse, his symptoms quickly worsened. At that point, Mr. Manuel sought emergency medical treatment at Johnson City Medical Center (JCMC).

Mr. Manuel arrived at the hospital complaining of chest pain that began approximately an hour and a half earlier. (Ex. 6 at 85.) Mr. Manuel characterized the pain as constant and moderate in intensity. It was located on the left side of his chest without radiation and was associated with nausea and vomiting. *Id.* His vital signs showed an elevation of blood pressure, but no evidence of lack of oxygen. Mr. Manuel reported a family history of hypertension. *Id.*

Upon admission to the hospital, Mr. Manuel underwent a variety of tests under the direction of admitting physician, Garik Misenar, M.D. (Ex. 5 at 4.) During the course of his observation, Mr. Manuel remained stable with no acute changes noted on serial EKGs. The lab work revealed no abnormalities, and the Troponin levels remained negative on three separate tests. The chest x-ray was also unremarkable. *Id.*

Dr. Misenar called in Dr. Kais Acli Al Balbissi for a cardiac consultation. Dr. Balbissi recommended a cardiac stress test, which he interpreted as revealing mild to moderate anterior wall ischemia (tissue damage) and mild inferior wall ischemia in Mr. Manuel's heart. *Id.* at 25. The Echocardiogram portion of the test was negative for

2

ischemia and the left ventricular function was normal. *Id.*

During the consultation, Dr. Balbissi noted Mr. Manuel's history. (Ex. 5 at 6.) He noted Mr. Manuel had a "history of polysubstance abuse with no prior diagnosed medical problems." He further noted Mr. Manuel complained of chest pain, "which started 1 day prior to admission," and was episodic, usually lasting a few hours before passing and then reoccurring. The pain did not radiate and was not associated with shortness of breath or sweating. Mr. Manuel's family history was positive for diabetes and hypertension. *Id.*

Dr. Balbissi concluded that while Mr. Manuel's chest pain had atypical features, given the abnormal stress test, Mr. Manuel's history of polysubstance abuse, as well as a possible family history of coronary artery disease, a cardiac catheterization was in order. Mr. Manuel agreed to the process. (Ex. 5 at 7.)

Dr. Balbissi performed the catheterization on February 11 by inserting the catheter through the right femoral artery. (Ex. 5 at 21.) The catheterization revealed no cardiac abnormalities. (Ex. 6 at 37.) However, Dr. Balbissi prescribed Imdur on the possibility Mr. Manuel suffered from vasospastic angina given that "Pt CP was precipitated by inhalation of fumes." *Id.* Mr. Manuel left the hospital on February 12, 2016, and was given work restrictions through February 16. (Ex. 5 at 4.)

On March 2, Mr. Manuel followed up with Nurse Practitioner (N.P.) Dawn Glass. (Ex. 5 at 1.) He complained of slight chest pain. The note indicated Mr. Manuel described smelling "diesel fumes and other chemical smells" at work. *Id.* Mr. Manuel complained of pain and discomfort in his right groin radiating into his right upper leg. *Id.* N.P. Glass ordered an ultrasound to rule out a pseudoaneurysm in the right groin. *Id.* at 2. She took Mr. Manuel off work until March 16. (Ex. 5 at 31.) On March 19, N.P. Glass took him off work until April 1.

Following the ultrasound, Mr. Manuel returned to Dr. Balbissi on April 1. Dr. Balbissi noted the ultrasound did not reveal a pseudoaneurysm. (Ex. 5 at 47.) Mr. Manuel stated he was doing well other than ongoing right leg pain and tingling. He had been taking Norvasc for possible coronary spasm. *Id.* Dr. Balbissi recommended a neurological evaluation to rule out a possible neuropathy in Mr. Manuel's right thigh. *Id.* at 48.

On April 14, Dr. Thomas Perry, a neurologist, evaluated Mr. Manuel. (Ex. 4 at 2.) Mr. Manuel told Dr. Perry he "evidently was exposed to carbon monoxide via diesel trucks in an enclosed environment." *Id.* Mr. Manuel informed Dr. Perry he developed a headache, and then later experienced chest pain and shortness of breath. Dr. Perry recorded that Mr. Manuel told him that, "they decided a likely diagnosis was carbon monoxide poisoning." *Id.*

3

Dr. Perry further noted that following the heart catheterization, Mr. Manuel developed pain, weakness, and numbness in his right leg, causing it to drag occasionally. *Id.* He ordered an EMG, and the results revealed a "chronic, mild femoral neuropathy," but with an excellent prognosis for recovery. *Id.* at 4. On April 15, Dr. Perry wrote a note stating Mr. Manuel "unfortunately developed a femoral neuropathy after cardiac catheterization" and recommending he refrain from heavy lifting, vigorous physical activity, and standing for prolonged periods. He noted it could take four to six months for Mr. Manuel to recover. *Id.* at 8.

Mr. Manuel began physical therapy for his right leg on April 20. The initial report noted Mr. Manuel reported his symptoms began after breathing diesel fumes for a week in a poorly ventilated room. (Ex. 4 at 9.) He stated it caused him to feel as though "his heart [was] jumping out of his chest" with panting and shortness of breath. *Id.* He reported breathing in carbon monoxide, and "'not getting enough oxygen to his heart.'" *Id.* However, his primary issue at that time was pain, weakness, and tingling in his right leg. *Id.*

Mr. Manuel returned to Dr. Balbissi's office on June 3. (Ex. 5 at 44.) The doctor noted Mr. Manuel's chest pain improved with the use of amlodipine. *Id.* He diagnosed Mr. Manuel with atypical chest pain and right leg pain. *Id.* at 45.

On June 22, Mr. Manuel returned to Dr. Terry. (Ex. 4 at 1.) He had completed physical therapy, but still experienced some numbness, weakness, and muscle spasms in his right leg. *Id.*

The parties took the deposition of Dr. Hal Roseman, whom A-1 Workforce retained to provide an expert medical opinion regarding Mr. Manuel's condition. (Ex. 2.) Dr. Roseman testified he is a board-certified cardiologist and a clinical cardiologist with Centennial Medical Center. (Ex. 2 at 6-7.) Dr. Roseman further testified he reviewed extensive medical records in preparing his opinion regarding Mr. Manuel. *Id.* at 7-11.

Dr. Roseman testified the arterial blood gas test obtained at JCMC indicated there were no unusual gases in Mr. Manuel's blood stream at the time, which "certainly eliminates" the possibility of carbon monoxide being a factor in Mr. Manuel's symptoms. *Id.* at 12-13. He further testified that the Troponin levels were normal, which indicated Mr. Manuel did not suffer a heart attack. *Id.* at 15. Other lab tests, as well as the electrocardiograms, were normal. *Id.* at 15-16.

With regard to the ischemia Dr. Balbissi noted in the stress test, Dr. Roseman noted the importance of the fact that Mr. Manuel did not experience chest pain during the stress test, and that the echocardiogram was normal. *Id.* at 17. Given these factors, Dr. Roseman testified that Mr. Manuel's chest pain was not due to a cardiac event, and that

4

the cardiac catheterization was unnecessary. *Id.* at 29. He further opined that the cardiac catheter struck a femoral nerve, causing Mr. Manuel's right leg symptoms. *Id.*

With regard to the cause of Mr. Manuel's chest pain, when explaining why the cardiac catheterization was unnecessary, Dr. Roseman stated that it was "clearly given that the initiation of the chest pain was due to the inhalation of diesel fumes," which would not have a cardiac implication. *Id.* at 20. However, when specifically asked about Mr. Manuel's diesel fumes exposure and his symptoms, Dr. Roseman stated:

> Well, first of all, Mr. Manuel didn't – does not have coronary artery disease. So the chest discomfort that was evident there is unclear – as it relates to the actual work incident of diesel fumes. Again, I will give Mr. Manuel the benefit of the doubt, but essentially, it is curious to me that the initial experience that Mr. Manuel had was that of a general feeling of sickness without any mention of chest discomfort. The chest discomfort followed after that, which, as I said, would only be considered, based upon my understanding of diesel fuel inhalation, to be a consequence of a primary pulmonary or lung problem. So, in essence, the chest pain that was identified in the – in the records – is of curiosity to me. I will say that at least based upon the records, it appears that the chest pain that we are discussing, at least according to Dr. Al Balbissi, actually started one day prior to admission so there is some uncertainty as to its temporal relationship with the actual work event at 9:30 a.m. on February 10th, 2015.

*Id.* at 30-31.

On cross-examination, Mr. Manuel specifically asked Dr. Roseman if exposure to diesel fumes caused his symptoms. *Id.* at 33. Dr. Roseman responded:

> Dr. Al Balbissi reported that you had these symptoms one day prior to admission. So based on that, it certainly does not appear to be a relationship in time between your exposure to the fumes and the chest pain that you developed in the hospital. With that said, assume that that was incorrect, that an hour and a half after you left work you were admitted to Johnson City Medical Center. So at 11:35, I think, you – it was around at 9:30 that the records seem to indicate that you became acutely sick; there is a possibility that your chest pain, as I've stated in terms of my understanding of diesel fuel – or pardon me – diesel fume inhalation, could be related. But the testing that was performed and the evaluation of you at the time of the hospitalization from my standpoint and from the interpretation of the national guidelines, were unnecessary and excessive. So I am not claiming that you are fabricating your symptoms. I am relying on the medical record to provide an analysis. So in essence, these are the

5

points that I offer you: Number one is that, at least according to Dr. Balbissi, you had chest discomfort one day prior to admission, which would mean that the events of February 10, 2015, followed after the onset of your chest pain. So more likely than not just based on logic, they were probably unrelated. But let's – number two, if we assume that Dr. Balbissi's history is incorrect, then your chest pain, certainly if you were having respiratory problems, possibly could be related to the fumes. But as I shared in my description of the occupational hazards of diesel fume inhalation is that chest pain usually follows from lung problems related to the inhalation. Those problems did not seem to be evident, at least by the history-taking by the health care providers at the hospital. It could have been an oversight, I agree. The other thing is that regardless of whether you had, you know, respiratory problems, it did not seem based upon the arterial blood gas and the chest x-ray to have any acute physical effects on you. It may have produced the symptoms of feeling sick, but it did not cause any acute injury, if you will; at least based upon objective testing.

*Id.* at 33-35.

Scott Hammitt, manager at FIT, testified the warehouse where Mr. Manuel worked was approximately 40,000 square feet in size with 25 to 30 foot ceilings, and that the ventilation fans were in operation on February 10, 2015. He further testified Mr. Manuel was the only employee who reported becoming sick on the 10th, despite the fact that he worked at the end of the line and was the farthest from the truck.

Mr. Manuel filed a Petition for Benefit Determination on April 30, 2015, after A-1 Workforce denied his claim based on compensability. (T.R. 1.) The Court entered an Initial Hearing Order on January 19, 2016. (T.R. 2.) The parties were unable to reach a post-discovery mediated agreement, and the Mediator filed a final Dispute Certification Notice on April 26, 2016. (T.R. 4.) The Court held a Compensation Hearing on April 26, 2016.

### Findings of Fact and Conclusions of Law

The Workers' Compensation Law must be interpreted fairly, impartially and consistent with basic principles of statutory construction, favoring neither the employee nor employer. Tenn. Code Ann. § 50-6-116 (2015). "[A]t a compensation hearing where the injured employee has arrived at a trial on the merits, the employee must establish by a preponderance of the evidence that he or she is, in fact, entitled to the requested benefits." *Willis v. All Staff*, No. 2014-05-0005, 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Tenn. Workers' Comp. App. Bd. Nov. 9, 2015); *see also* Tenn. Code Ann. § 50-6-239(c)(6) (2015) ("[T]he employee shall bear the burden of proving each and every element of the claim by a preponderance of the evidence.").

6

To be compensable, Mr. Manuel must show his alleged injury arose primarily out of and in the course and scope of his employment and was caused by an incident, or specific set of incidents, identifiable by time and place of occurrence. Tenn. Code Ann. § 50-6-102(14)-(14)(A) (2015). He must show, "to a reasonable degree of medical certainty that [his alleged work injury] contributed more than fifty percent (50%) in causing the . . . disablement or need for medical treatment, considering all causes." Tenn. Code Ann. § 50-6-102(14)(C) (2015). "Shown to a reasonable degree of medical certainty" means that, in the opinion of the treating physician, it is more likely than not considering all causes as opposed to speculation or possibility. Tenn. Code Ann. § 50-6-102(14)(D) (2015).

The medical evidence presented in Mr. Manuel's claim fails to meet the standards set out above. The first mention in the medical records of any causal relationship between Mr. Manuel's symptoms and his employment was Dr. Balbissi's note following the cardiac catheterization on February 11, 2015, stating Mr. Manuel may suffer from vasospastic angina given that "Pt CP was precipitated by inhalation of fumes."[3] However, Balbissi never made this diagnosis to a reasonable degree of medical certainty nor opined how the "inhalation of fumes" precipitated Mr. Manuel's symptoms.

On April 14, Mr. Manuel told the neurologist, Dr. Perry, "they" had diagnosed him with carbon monoxide poisoning; however, he offered no medical evidence at the hearing regarding such a diagnosis. (Ex. 4 at 2.) Furthermore, Dr. Perry never gave an opinion regarding the cause of Mr. Manuel's symptoms that resulted in his hospitalization, although he did opine that the cardiac catheterization led to the femoral nerve injury. (Ex. 4 at 8.)

Dr. Roseman's testimony was quite positive in his opinion that Mr. Manuel did not suffer a cardiac event on February 10, and that the cardiac catheterization was not reasonable or necessary for treatment of Mr. Manuel's symptoms. (Ex. 2 at 29.) With regard to the impact of the fumes from the truck, Dr. Roseman first testified that Mr. Manuel did not suffer a cardiac event because it was "clearly given that the initiation of the chest pain was due to the inhalation of diesel fumes." (Ex. 2 at 20.)

However, when specifically asked about the causal relationship between Mr. Manuel's exposure to diesel fumes on February 10 and the symptoms that led to his hospitalization, Dr. Roseman became much more equivocal. Dr. Roseman essentially opined that Mr. Manuel's exposure to fumes could have caused respiratory problems, which may have created chest pain and may have made him sick. However, there was nothing in the hospital records indicating shortness of breath; Mr. Manuel's blood tests did not reveal abnormal carbon monoxide levels; and, Dr. Balbissi indicated in his

---

[3] "CP" presumably stands for chest pain.

records that Mr. Manuel's symptoms began the day before. *Id*. at 33-35. Dr. Roseman inferred that these factors tended to rule out exposure to diesel fumes as the cause of Mr. Manuel's chest pain. *Id*.

Thus, the medical evidence in this claim establishes at best that Mr. Manuel's symptoms are *possibly* attributable to his work-related exposure to diesel fumes on February 10. Proof regarding causation cannot "be speculative or so uncertain regarding the cause of the injury that attributing it to the plaintiff's employment would be an arbitrary determination or a mere possibility." *Willis, supra,* at *26 (quoting *Tindall v. Waring Park Ass'n*, 725 S.W.2d 935, 937 (Tenn. 1987)).

Under the remedial nature and liberal interpretation of previous law, expert testimony establishing a possible causal connection, when combined with adequate lay testimony, may have been sufficient to establish causation. *Id.* However, that is no longer the case. An employee now has the burden of proving by expert testimony that "more likely than not considering all causes as opposed to speculation and possibility," his employment was the primary cause of his injury. Tenn. Code Ann. § 50-6-102(14) (2015). The Court finds the medical evidence presented in Mr. Manuel's case failed to do so.

Accordingly, the Court finds Mr. Manuel failed to prove he sustained an injury that primarily arose out of and in the course and scope of his employment with A-1 Workforce. *See* Tenn. Code Ann. § 50-6-102(14) (2015). Given the above finding, it is unnecessary to address other issues raised by the parties.

IT IS, THEREFORE, ORDERED that Mr. Manuel's request for workers' compensation benefits is denied.

**ENTERED THIS THE 5th DAY OF MAY, 2016.**

**Robert V. Durham, Judge**
**Court of Workers' Compensation Claims**

Right to Appeal:

Tennessee Law allows any party who disagrees with this Compensation Hearing Order to appeal the decision to the Workers' Compensation Appeals Board. To file a Notice of Appeal, you must:

1. Complete the enclosed form entitled: "Compensation Hearing Notice of Appeal."

2. File the completed form with the Court Clerk *within thirty days* of the date the Workers' Compensation Judge entered the Compensation Hearing Order.

3. Serve a copy of the Compensation Hearing Notice of Appeal upon the opposing party.

4. The appealing party is responsible for payment of a **filing fee in the amount of $75.00.** Within ten calendar days after the filing of a notice of appeal, payment must be received by check, money order, or credit card payment. Payments can be made in person at any Bureau office or by United States mail, hand-delivery, or other delivery service. In the alternative, the appealing party may file an Affidavit of Indigency, on a form prescribed by the Bureau, seeking a waiver of the filing fee. The Affidavit of Indigency may be filed contemporaneously with the Notice of Appeal or must be filed within ten calendar days thereafter. The Appeals Board will consider the Affidavit of Indigency and issue an Order granting or denying the request for a waiver of the filing fee as soon thereafter as is practicable. **Failure to timely pay the filing fee or file the Affidavit of Indigency in accordance with this section shall result in dismissal of the appeal.**

5. The party filing the notice of appeal, having the responsibility of ensuring a complete record on appeal, may request, from the Court Clerk, the audio recording of the hearing for the purpose of having a transcript prepared by a licensed court reporter and filing it with the Court Clerk within fifteen calendar days of the filing of the Compensation Hearing Notice of Appeal. Alternatively, the party filing the appeal may file a joint statement of the evidence within fifteen calendar days of the filing of the Compensation Hearing Notice of Appeal. The statement of the evidence must convey a complete and accurate account of what transpired in the Court of Workers' Compensation Claims and must be approved by the workers' compensation judge before the record is submitted to the Clerk of the Appeals Board. *See* Tenn. Comp. R. & Regs. 0800-02-22-.03 (2015).

6. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Workers' Compensation Appeals Board, the appeal will be docketed and assigned to an Appeals Board Judge for review. At that time, a docketing notice shall be sent to the parties. Thereafter, the parties have fifteen calendar days to submit briefs to the Appeals Board for consideration. *See* Tenn. Comp. R. & Regs. 0800-02-22-.02(3) (2015).

7. If neither party appeals the judgment to the Board of Appeals within thirty days of its entry by the Trial Court, the judgment becomes final. Either party may then

appeal directly to the Tennessee Supreme Court. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2015). Please review the Tennessee Rules of Appellate Procedure for specific information on procedure. *See* Tenn. Code Ann. § 50-6-225 (2015).

# APPENDIX

<u>Exhibits</u>:

1. First Report of Injury;
2. Deposition of Dr. Hal Roseman;
3. Medical Report of Dr. Roseman;
4. Medical Records of Tri-State Mountain Neurology;
5. Medical Records of Johnson City Medical Center;
6. Medical Records from Mountain States Health Alliance;
7. Wage Statement.


<u>Technical Record</u>:

1. Petition for Benefit Determination;
2. Initial Hearing Order;
3. Transfer Order;
4. Dispute Certification Notice;
5. A-1 Workforce's Witness and Exhibit List.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Compensation Hearing Order Denying Benefits was sent to the following recipients by the following methods of service on this the 5th day of May, 2016.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|---|---|---|---|---|
| Darrell Manuel | X | | | 204 W. Chilhowie Ave. Johnson City, TN 37064 |
| J. Eric Harrison | | | X | eharrison@wimberlylawson.com |

Penny Shrum, Clerk of Court
Court of Workers' Compensation Claims
WC.CourtClerk@tn.gov

12